IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                          CR. No. 09-1251 JP

ALAN GREEN,

    Defendant.

MEMORANDUM OPINION AND ORDER

On September 8, 2009, the Defendant filed a Motion to Suppress Physical Evidence and Request for Disclosure of Parole Files (Doc. No. 24)(motion to suppress). On October 1, 2009, a hearing was held on the motion to suppress. Defendant was present at the hearing along with his attorney, Daniel Tallon. Louis Valencia, Assistant United States Attorney, represented the Plaintiff United States of America (USA). With Mr. Valencia were Bureau of Alcohol, Tobacco, Firearms, and Explosives Senior Special Agent Cindy Martinez and James Sanchez, a technician. Having considered the briefs, oral argument by counsel, admitted exhibits, and the testimony of New Mexico Corrections Officer Donald Frank, New Mexico Probation and Parole Officer (PPO) Martin Aragon, and PPO Janeen Arble, the Court concludes that: 1) Defendant's request for disclosure of parole files in order to argue the motion to suppress is now moot; and 2) the motion to suppress should be denied.

*A. The Factual Findings*

Defendant is a convicted felon associated with an Albuquerque gang known as the West Side Locos. Defendant's gang moniker is "Shadow" and in fact the name "Shadow" is tattooed on Defendant's body. On May 15, 2008, the New Mexico Parole Board released Defendant on

parole for a period of approximately one year.  Certificate of Parole at 1, Govt. Ex. 6.  The Certificate of Parole, which Defendant signed, specifically states that the parolee "will submit to reasonable warrantless searches per Probation and Parole Division Policy."  *Id*. at 2.  PPO Arble was assigned to supervise Defendant while he served this parole term.  She also knew that Defendant was known as "Shadow."[1]

After being paroled, Defendant was placed in a halfway home.  Soon after beginning work at Little Caesar's Pizza, located at the corner of Atrisco Dr. NW and Central Ave. NW, Defendant asked PPO Arble several times if he could move to his girlfriend's house at 611 Woodland NW so he could be closer to Little Caesar's Pizza.  Defendant's girlfriend, Desiree Chavez, had been driving Defendant from Little Caesar's Pizza to the halfway home on the other side of Albuquerque. PPO Arble had rejected Defendant's requests to move until July 3, 2008 when she finally approved the move.  That same day, PPO Arble modified Defendant's Corrections Management Information System (CMIS) file to reflect his new address at 611 Woodland NW.[2]

On July 9, 2008, PPO Arble conducted her first field call at 611 Woodland NW.  Defendant was not home, but PPO Arble met Ms. Chavez and walked through the residence, including the bedroom.  PPO Arble did not discover any contraband bust saw male clothing in the bedroom.  The next day, Defendant told PPO Arble that only he and Ms. Chavez lived at the residence.

---

[1]Defendant's previous Probation and Parole Officer, PPO Aragon, likewise knew that Defendant went by the name of "Shadow."

[2]This CMIS file may have been modified again on August 18, 2008.  Govt. Ex. 4 at 3.  However, there is no evidence as to what information, if any, in that file was subsequently modified or who may have made a modification.

PPO Arble conducted further field calls at 611 Woodland NW on July 14, July 25, and July 28, 2008.  Defendant was not present at any of these field calls.  Nonetheless, PPO Arble was able to walk through the home, including the bedroom, with Ms. Chavez during the July 25 and July 28, 2008 field calls.  PPO Arble found nothing unusual on those field calls.  PPO Arble, however, routinely saw male clothing in the bedroom when she made field calls to the residence.

On July 23, 2008, Defendant visited PPO Arble at her office and informed her that Ms. Chavez was pregnant. On July 30, 2008, Defendant indicated to PPO Arble that Ms. Chavez's mother had been paying for the house at 611 Woodland NW but now he was paying for the house.

On August 3, 2008, Albuquerque Police Officers discovered Defendant in the company of a sex offender parolee, a violation of Defendant's parole.  As a consequence of this incident, Defendant was required to go the next day to PPO Arble's office.  At that time, PPO Arble noted Defendant had tested positive for marijuana use as a result of a drug test taken on July 31, 2008. Moreover, an analysis of Defendant's urine at the Probation and Parole Office, that day, also indicated marijuana use. In fact, Defendant admitted to PPO Arble that he smoked marijuana. PPO Arble did not detain Defendant for parole violations but instead allowed Defendant to leave the office.

On August 5, 2008, PPO Arble conducted another field call at 611 Woodland NW. Again, Defendant was not present.  PPO Arble met with Ms. Chavez and walked through the residence, including the bedroom.  Once more, PPO Arble did not discover anything amiss.

Also, on August 5, 2008, Joseph Anaya, a member of the West Side Locos and an inmate at the Southern New Mexico Correctional Facility, telephoned a male named "Shadow" at 10:30 a.m.  The phone number Mr. Anaya called was the phone number listed as Defendant's phone

number in his CMIS file.  During that conversation, "Shadow" talked about his trouble with the police noting that the police did not get his gun or drugs, and that he was smoking marijuana.  At about 7:30 p.m. that evening, Dakota Briscoe, another West Side Locos inmate incarcerated at the Southern New Mexico Correctional Facility, contacted "Shadow," this time through a third party, using the same telephone number as before.  In this second conversation, "Shadow" stated that he had a .38 revolver and referred to his pregnant girlfriend.

Corrections Officer Frank monitored these telephone calls and recognized Defendant's voice as well as his moniker of "Shadow."  Officer Frank personally knew Defendant from his previous incarceration at the Southern New Mexico Correctional Facility. Officer Frank also confirmed that the telephone number for "Shadow" belonged to Defendant by checking Defendant's CMIS file.  Consequently, Officer Frank sent recordings of these conversations to the Albuquerque Probation and Parole Office which were received by August 7, 2008.

After receiving the recordings, PPO Aragon confirmed that the "Shadow" in the recordings was Defendant by matching the telephone number of the conversations with the telephone number in Defendant's CMIS file.  Defendant was then placed under a brief surveillance the morning of August 7, 2008 after which PPO Arble called Defendant and asked him to come to the Probation and Parole Office.  Shortly thereafter, Defendant arrived at the office where he again tested positive for marijuana use.  Defendant was then taken into custody and driven to 611 Woodland NW where PPOs Arble, Aragon, and two other PPOs searched the home for contraband.[3]  The PPOs found marijuana, a .38 handgun under a pillow on the bed, and

---

[3] PPO Aragon testified that on August 7, 2008, Defendant's CMIS file indicated that Defendant resided at 611 Woodland NW.

ammunition for the handgun.[4] During the search, PPO Arble noted that there were men's clothing in the bedroom. Moreover, PPO Aragon recalled that Ms. Chavez stated that the bedroom was the room where she and the Defendant slept.

On May 12, 2009, Defendant was indicted for being a felon in possession of a gun and ammunition in violation of 18 U.S.C. §§922(g)(1) and 942(a)(2). Specifically, the indictment alleges that on August 7, 2008, Defendant, a convicted felon, knowingly possessed a Smith & Wesson model 60 .38 caliber handgun and seven .38 special caliber cartridges of ammunition.

## B. Discussion

### 1. Defendant's Request for Parole Records

The Defendant requested in the motion to suppress that the USA be compelled to produce his parole records. At the hearing on the motion to suppress, Defendant's counsel, Mr. Tallon, indicated that, except for photographs taken during the search of 611 Woodland NW, he had since received the parole records which he had previously requested from the USA.[5] Mr. Tallon noted that Defendant would not be prejudiced in proceeding with the hearing on the motion to suppress without those photographs. Consequently, the Court determines that, with respect to deciding the motion to suppress, Defendant's request for parole records is now moot.

### 2. Merits of the Motion to Suppress

As a preliminary matter, the USA initially argued that the Defendant lacked standing to bring this motion to suppress. The USA, however, conceded at the hearing on the motion to suppress that Defendant has standing to challenge a search of the house where he resided,

---

[4] Ms. Chavez and a friend were also at the house while the PPOs searched the home. A PPO found another handgun in the friend's purse.

[5] PPO Aragon later testified that he could not locate the photographs.

namely, the house at 611 Woodland NW.

Defendant argues that the gun and ammunition should be suppressed for several reasons. Defendant contends first that the PPOs did not have a reasonable belief that he actually resided at 611 Woodland NW. Next, Defendant argues that the search of 611 Woodland NW was not supported by reasonable suspicion of illegal activity. Finally, Defendant raises a staleness issue with respect to the amount of time which passed between the August 5, 2008 monitored telephone calls and the August 7, 2008 search of 611 Woodland NW.

### a. *Defendant's Residence*

Defendant asserts that the PPOs could not have reasonably believed that he resided at 611 Woodland NW because he was only an occasional visitor to the home. The evidence, on the other hand, shows otherwise. First, on July 3, 2008, PPO Arble specifically approved Defendant's move to Ms. Chavez's home at 611 Woodland NW so Defendant could live closer to his place of employment. Second, Defendant told PPO Arble on July 10, 2008 that only he and Ms. Chavez resided at Ms. Chavez's house. Third, Defendant informed PPO Arble on July 30, 2008 that he was going to start paying for the house where he was living with Ms. Chavez, namely the house at 611 Woodland NW. Fourth, as of August 7, 2008, the 611 Woodland NW address was listed as Defendant's address in his CMIS file. Fifth, PPO Arble made field calls to 611 Woodland NW on several occasions where she met with Ms. Chavez and observed male clothing in the bedroom. Finally, Ms. Chavez told PPO Aragon that Defendant slept in the bedroom which the PPOs searched. The above evidence is more than sufficient to lead a reasonable person to conclude that Defendant resided at 611 Woodland NW and that he was not just an occasional visitor to that house.

b. *Reasonable Suspicion of Illegal Activity at 611 Woodland NW*

Next, Defendant asserts that the PPOs violated his Fourth Amendment right to be free from unreasonable searches because they did not have a reasonable suspicion that he was involved in illegal activity at 611 Woodland NW. A probationer or parolee's residence is protected by the Fourth Amendment's requirement that searches be reasonable. *Griffin v. Wisconsin*, 483 U.S. 868, 872 (1987). In determining the lawfulness of a warrantless search of a probationer or parolee's residence, the courts turn to state law. *United States v. Tucker*, 305 F.3d 1193, 1200 (10th Cir. 2002). "[A] parole search may be upheld if it is conducted pursuant to a state parole/probation system that itself complies with the Fourth Amendment." *Id.* (citing *Griffin*, 483 U.S. at 873).

Under New Mexico law, warrantless probationer or parolee searches must be supported by reasonable suspicion as defined by state law. *State v. Baca*, 135 N.M. 490, 2004-NMCA-048 ¶43. New Mexico state law defines reasonable suspicion as "an awareness of specific articulable facts, judged objectively, that would lead a reasonable person to believe criminal activity occurred or was occurring." *Id.* In New Mexico, exigent circumstances are unnecessary to carry out a warrantless search of a parolee's home. *Id.* at ¶44. Additionally, New Mexico Corrections Department Policy Statement CD-050700 (effective Feb. 21, 2004; revised Feb. 25, 2009) states that Probation and Parole Division staff can rely on information from law enforcement officials to form reasonable suspicion if they "seek corroborating evidence before conducting the actual search."

Like New Mexico state law, a probationer or parolee search is reasonable for Fourth Amendment purposes if it is supported by reasonable suspicion. *See United States v. Knights*, 534 U.S. 112, 118, 121 (2001) (finding that probable cause was not necessary to search probationer's apartment and that reasonable suspicion is sufficient). "Reasonable suspicion is a

less demanding standard than probable cause." *Tucker*, 305 F.3d at 1200 (citing *United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002)). While probable cause means "a fair probability that contraband or evidence of a crime will be found," reasonable suspicion is merely a particularized and objective basis for suspecting criminal activity. *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989) and *Treto-Haro*, 287 F.3d at 1004). To determine whether the parole officers had reasonable suspicion under the Fourth Amendment, a court considers both the quantity of information possessed by law enforcement and its reliability. *Id.* (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). Both factors must be viewed under the totality of the circumstances. *Id.*

In this case, Defendant consented to reasonable warrantless searches when he signed the Certificate of Parole. Moreover, seven days and three days prior to the search, and on the day of the search, Defendant tested positive for marijuana use. Defendant even admitted to PPO Arble three days before the search that he smoked marijuana. This illegal use of drugs clearly violated a condition of Defendant's parole. *See* Certificate of Parole at 2 ("I will not illegally possess, use or sell any narcotic drug and/or controlled substances or paraphernalia related thereto."). Defendant's confirmed use of marijuana was sufficient to constitute reasonable suspicion to search Defendant's residence, at the very least, for marijuana.

Nevertheless, the day before the search or maybe the day of the search, the Albuquerque Probation and Parole Office received the recordings of telephone conversations which Officer Frank believed involved Defendant, and which indicated he was smoking marijuana and possessed a .38 handgun. Defendant asserts that there is no corroborating evidence to link him to those conversations. The Court disagrees. First, Officer Frank personally knew Defendant and therefore was in a position to recognize his voice. Second, the conversations referred to "Shadow," a name which Officers Frank, PPO Arble, and PPO Aragon all knew was

Defendant's gang name. Third, the phone number used to call "Shadow" matched the phone number listed for Defendant in his CMIS file. Fourth, a reasonable person could have concluded that the first recorded conversation referred to the August 3, 2008 encounter Defendant had with police. Fifth, the statement in the first recorded conversation regarding marijuana use mirrors Defendant's own use of marijuana. Finally, the second recorded conversation's discussion of the pregnancy of "Shadow's" girlfriend fits Defendant's situation as well. Considering the quantity and reliability of the evidence under the totality of these circumstances, the Court determines that the PPOs had a reasonable suspicion that Defendant also illegally possessed a gun. In sum, the PPOs did not violate Defendant's rights under either New Mexico law or the Fourth Amendment by conducting a warrantless search of his residence.

      *c. Staleness Argument*

Defendant further argues that the recorded conversations were "stale" in that the receipt of those conversations by the Albuquerque Probation and Parole Office was not adequately related in time to the date of the search. In the motion to suppress, Defendant indicated that he did not know the exact date upon which the Albuquerque Probation and Parole Office received the recorded conversations that led to the search. The motion to suppress at 2 states:

> On a date unknown to counsel, but believed to be some time between May 15, 2008 and August 7, 2008, PPD agents intercepted a telephone call between an inmate at the Southern New Mexico Correctional Facility in Las Cruces, New Mexico and a male alleged to be Alan Green.

The length of time between the receipt of information used to support a search and the time a search is conducted is relevant to a finding of probable cause or reasonable suspicion to search. *See United States v. Cortez-Galaviz*, 495 F.3d 1203, 1211 (10th Cir. 2007)(holding that a "not found" report from the Utah state insurance database, updated approximately 20 days earlier, was sufficient to support a traffic stop). To determine whether information upon which a search is based is stale, the Tenth Circuit considers the nature of the crime, the length of criminal

activity, and the nature of the items seized. *United States v. Fiscus*, No. 02-4172, 64 Fed. Appx. 157, at **4 (10th Cir. April 29, 2003)(unpublished)(citing *United States v. Myers*, 106 F.3d 936, 939 (10th Cir.1997)(finding that five month gap between acquisition of and action on information of ongoing drug activity did not render information stale)). When a defendant is involved in ongoing illegal activity, however, the length of time between the receipt of information and the search is less critical. *See United States v. Mathis*, 357 F.3d 1200, 1207 (10th Cir.2004)(noting that "ongoing and continuous activity makes the passage of time less critical when judging the staleness of information"). For example, the court in *Fiscus* held that a delay of two months from the time the informant spoke to authorities until the time of the search did not render that search stale. *Id.* at **4.

In *United States v. Tafoya*, No. 07-cr-697 (Memorandum Opinion and Order (Doc. No. 43), filed Oct. 18, 2007), the Honorable United States District Court Judge M. Christina Armijo found that possession of a firearm by a felon is an ongoing offense, and that a search warrant affidavit containing information regarding a firearm at a person's house was not stale even though the search was performed one month after the information was obtained.

> Here the property to be seized was not something that is destroyed or consumed during the course of its normal use (such as drugs), nor was it something that one would expect to be quickly passed on to another owner (such as stolen merchandise). Rather, we are dealing with a shotgun that was used or possessed in the course of an ongoing fugitive-recovery business where it is reasonable to infer that firearms are part of the "tools of the trade." Under these circumstances, it was reasonable for the Magistrate Judge to infer that the nature and length of the suspected criminal activity (being a felon in possession of a firearm) was of an ongoing and continuous nature.

*Id.* at 19. Significantly, the Tenth Circuit considers timeliness of information as one of many factors to consider when assessing whether a search is supported by reasonable suspicion or probable cause. *See Cortez-Galavin*, 495 F.3d at 1209.

Here, the August 5, 2008 phone calls to Defendant were placed only two days before the search. Furthermore, Defendant had tested positive for marijuana use just seven and three days

before the search as well as on the day of the search. Considering the nature of Defendant's crimes, the length of the criminal activity, and the nature of the items seized, it is clear that the information the PPOs relied upon to conduct the warrantless search of Defendant's residence was not stale.

IT IS ORDERED that Defendant's Motion to Suppress Physical Evidence and Request for Disclosure of Parole Files (Doc. No. 24) is denied.

_____
SENIOR UNITED STATES DISTRICT JUDGE